**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHERI CURLER,

     *Plaintiff,*

*v.*                              CASE NO. 11-CV-14570

COMMISSIONER OF             DISTRICT JUDGE DENISE PAGE HOOD
SOCIAL SECURITY,            MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that Defendant's Motion for Summary Judgment be **DENIED**, and that the case be **REMANDED FOR AN AWARD OF BENEFITS**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 10.)

Plaintiff was 41 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 36.) Plaintiff's employment history includes work as cashier for six months,

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

a day care worker for two years, and a teacher's assistant for three years. (Tr. at 164.) Plaintiff filed the instant claim on September 6, 2007, alleging that she became unable to work on November 1, 2006. (Tr. at 132.) The claim was denied at the initial administrative stage. (Tr. at 59.) In denying Plaintiff's claim, the Commissioner considered disorders of the back, discogenic and degenerative, and affective disorders as possible bases for disability. (*Id.*) On May 10, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") Elliott Bunce, who considered the application for benefits *de novo.* (Tr. at 11-25; 31-58.) In an decision dated June 29, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 21.) Plaintiff requested a review of this decision on June 30, 2010. (Tr. at 7-10.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, after the review of additional exhibits[2] (Tr. at 5, 214-28, 229-31, 310-23), on August 22, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On October 17, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.    Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

*See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility

requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the

national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since July 17, 2008, the application date. (Tr. at 16.) At step two, the ALJ found that Plaintiff's degenerative disc disease, obesity, systemic lupus erythematosus, depression, anxiety, and substance addiction, in remission were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 16-18.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 19.) The ALJ also found Plaintiff was a younger individual, age 18 to 49, on the date the application was filed. (Tr. at 20.) At step five, the ALJ found that Plaintiff retained the residual functional capacity to perform a limited range of light work. (Tr. at 18-19.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 21.)

### E.    Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated for both mental and physical impairments. As to physical impairments, Plaintiff was treated by Howard Hurt, D.O., from August through October of 2007 (Tr. at 280-86) and by Steven Beall, M.D., of the Michigan Neurology Associates from March 2008 through January 2010. (Tr. at 332-58.) Plaintiff was referred to and treated by Sajeev Prakash, M.D., from December 2009 through May 2010. (Tr. at 359-64, 435-39.) As to mental impairments, Plaintiff was treated at List Psychological Services from May 2006 through June 2007 (Tr. at 255-79), the Bay Area Health Clinic from February 2007 through October 2007 (Tr. at 232-47), and Michigan Psychiatric and Behavioral Associates in September of 2007 (Tr. at 248-54). Plaintiff was also treated by Michael Ingram, M.D., from September 2007 through March 2010. (Tr. at 251-54, 368-71, 373-74, 382, 387-405.)

### 1.      Physical Impairments

In February 2006, it was noted that Plaintiff had "[n]o significant health problems that contribute to current [mental health] symptoms." (Tr. at 265.)

An MRI of the lumbar spine taken on May 18, 2007, was "negative." (Tr. at 243.)

A Physical Residual Functional Capacity ("RFC") Assessment was completed by Larry Thompson, M.D., on January 23, 2008. (Tr. at 298-305.) The assessment concluded that Plaintiff was able to occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for at least 2 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in her ability to push or pull. (Tr. at 299.) The assessment also concluded that Plaintiff should never climb ladders or scaffolds and was occasionally limited in her ability to perform other postural tasks. (Tr. at 300.) There were no manipulative, visual, communicative or environmental limitations established. (Tr. at 301-02.)

On March 7, 2008, Plaintiff was examined by Steven Beall, M.D., of Michigan Neurology Associates. (Tr. at 335-36.) Dr. Beall found that Plaintiff was oriented as to person, place and time, and that her "[a]ttention span, concentration, registration, recent and remote memory, language and fund of knowledge [were] all normal." (Tr. at 335.) Dr. Beall concluded that Plaintiff had "a myelopathic monoparesis in the left lower extremity as well as headaches" and that the "[p]ossible causes" of these were "structural, metabolic, demyelinative, vasculic or vascular." (Tr. at 336.) Various tests were recommended and Plaintiff was given a headache diary and a headache-free diet to follow. (*Id.*)

On September 5, 2008, Dr. Beall noted that Plaintiff's gait and station were "[n]ormal without any evidence of tandem ataxia or positive Romberg." (Tr. at 337.) Dr. Beall indicated that an MRI done in May 2008 showed:

> multiple abnormal small 1 to 2 mm white signals but the location, configuration, number and size were not given. It was thought that multiple sclerosis should be considered along with vasculitis and Lyme disease. MRI of the cervical spine showed a large right paracentral C5-6 herniated nucleus polposus but there was no mention that there was any cord compression. There was spinal stenosis.

(Tr. at 338.) Dr. Beall noted that Plaintiff's headaches were "still going on" and that she had "a myeloparesis and this has gotten worse, since I last saw her in March." (*Id.*) He stated that it was "possible" that it was "vascular, vasculic, demyelinative or structural." (*Id.*)

On October 10, 2008, Plaintiff's gait and station were normal, muscle tone in all extremities was normal, an "MRI of the brain showed four juxtacortical lesions, four paraventricular lesions one of which would be specific for multiple sclerosis if put in the proper clinical context." (Tr. at 229.) Dr. Beall also noted that an "MRI of the cervical spine was essentially unremarkable except that there was a disc herniation that mildly impressed the anterior part of the cord at C5-6." (*Id.*) Dr. Beall stated that Plaintiff's:

> myelopathic monoparesis has gotten significantly better . . . . She fits criteria for which is called the clinically isolated syndrome with a positive MRI. The MRI does not fulfill space criteria for multiple sclerosis although that diagnosis is possible. She also does not fit the time component for that disease. There are many other etiologies that can mimic this, she is still in the midst of her workup.

(Tr. at 340.)

On November 21, 2008, Dr. Beall noted that Plaintiff's gait and station were normal, muscle tone was normal, and that her "myelopathic quadriparesis is even further resolved . . . ." (Tr. at 342.) He noted that she had "what we call a clinically isolated syndrome with a positive MRI." (*Id.*)

On January 3, 2009, Dr. Beall noted that Plaintiff's gait, station, and muscle tone were all normal and he indicated that Plaintiff was going to "get her blood work done for mimics." (Tr. at 343-44.) On March 6, 2009, Plaintiff's gait, station, and muscle tone were all normal and Plaintiff's "hypercoagulate blood workup was all negative for any signs of lupus." (Tr. at 346.) Dr. Beall indicated that Plaintiff "has had complete resolution of her myelopathic quadriparesis" and that further testing would be done to determine whether she had multiple sclerosis or Sjorgren's disease. (*Id.*)

On August 14, 2009, Dr. Beall again noted that Plaintiff's myelopathic quadriparesis was "resolved" and that she would need to see a specialist regarding "possible Sjogren's disease." (Tr. at 347.)

In December 2009, after his initial evaluation, Dr. Prakash noted that:

> Although this 41-year-old lady denies dry eyes and dry mouth, she had dry conjunctivae, no salivary pooling, and her anti-SSA is positive and hence, she has Sjogren's syndrome. But she also has headache with multiple white matter lesions on her brain MRI and the question is whether she has CNS Sjogren's syndrome. Considering that she has headache for 10 years, it appears rather unlikely that she has Sjogren's syndrome, but the only definitive way to find out that would be to do spinal fluid analysis. . . . I discussed my impression with the patient and explained to her that it appears that she has Sjogren's syndrome but we should do blood work one more time just to make sure that there is no lab error since she herself denies any dry eyes and dry mouth. . . . The patient will see me back for follow-up about 2 weeks after she has the spinal fluid testing.

(Tr. at 362.) On January 10, 2010, Dr. Prakash indicated:

> With the myalgias, malar rash, fatigue, anmeia, positive anti-DNA, postivie anti-chromatin, positive antiphospholipid and elevated C-reactive protein, the patient has systemic lupus erythematosis. In view of multiple white matter lesions in brian, we need to make sure that she does not have CNS lupus.

(Tr. at 364.)

On February 5, 2010, Dr. Prakash noted that "[c]onsidering that [Plaintiff] has clear-cut systemic lupus erythematosus, it would be hard to imagine that she has 2 separate diseases going on, multiple sclerosis causing the brain lesions and systemic lupus erythematosus. On the other hand, oligoclonal protein is elevated but anti-nuclear antibody, anti-SSA and anti-SSB are negative." (Tr. at 435.)

## 2. Mental Impairments

In March 2006, Plaintiff was assessed with a GAF score of 58. (Tr. at 271.)

Plaintiff was discharged from List Psychological Services on December 6, 2006, and it was noted that she was "largely noncompliant with attendance[.]" (Tr. at 256.) Plaintiff had been "under the care of Dr. Berkley for med mgmt." (*Id.*)

In June 2007, Dr. Berkley assessed that Plaintiff was mildly impaired with respect to physical health and sexual functioning, and was moderately impaired as to marriage/relationship/family, job/school performance, friends/peer relationships, financial

situation, hobbies/interests, play activities, activities of daily living, eating/sleeping habits, ability to control temper, and ability to concentrate. (Tr. at 257.)[3]

On September 18, 2007, Michael Ingram, M.D., performed a Comprehensive Psychiatric Assessment on Plaintiff. (Tr. at 251-54, 368-71.) Dr. Ingram noted that Plaintiff was "alert and oriented x3[,]" that her immediate, short-term and long-term memory was "intact[,]" that her concentration was normal, and that she had a general fund of knowledge. (Tr. at 253, 370.) Plaintiff reported that she was never married, had three children, and that her longest job was held for three years. (*Id.*) It was noted that Plaintiff's medical problems included "history of headaches, stress urinary incontinence, gestational diabetes, back pain and anemia and also some rectal bleeding." (Tr. at 254, 371.) Dr. Ingram diagnosed major depression, recurrent and anxiety disorder, NOS, assessed a GAF score of 41-50, and a fair prognosis. (Tr. at 254, 371.)

Plaintiff was examined at the request of Disability Determination Services ("DDS") on January 15, 2008, by Ann L. Date, Psy.D., at Partners in Change. (Tr. at 287-93.) At that time, it was noted that Plaintiff was "able to drive, manage money, do laundry, cook, and clean . . . [but that] grocery shopping [was] difficult[] at times due to her back and she ignores cleaning the house due to depression." (Tr. at 290.) Plaintiff's "carriage, station and gait appeared unremarkable" and "[n]o overt pain behaviors were observed." (Tr. at 290.) Plaintiff's speech was noted as "logical, organized and relevant." (Tr. at 291.) Plaintiff was oriented as to person, place, and time, her memory was good, information was appropriately provided, but she became "frustrated" and "lost concentration" when subtracting because she "could not recall if she was subtracting seven or six[.]" (*Id.*) Plaintiff was diagnosed with mood disorder NOS and was given a GAF score of 52. (Tr. at 292.)

On January 23, 2008, Plaintiff was evaluated by Michael Ingram, M.D., who diagnosed recurrent mild major depressive disorder. (Tr. at 373.) Dr. Ingram also noted that Plaintiff's speech was normal, affect was appropriate, intensity was exaggerated, thought content was normal,

---

[3]The possible assessment categories were: no impairment, mild impairment, moderate impairment, marked impairment and extreme impairment. (Tr. at 257.)

thought process was coherent, attention was normal, perception was normal, intellect was average, insight was good, and judgment was appropriate. (*Id.*) Dr. Ingram discontinued Plaintiff's prescription medication and referred her to therapy, noting that therapy does "require regular attendance" and there "have been some concerns with the attendance in the past" but he was willing to "give the patient the benefit of the doubt." (Tr. at 374.)

On January 25, 2008, a case analysis completed by Joe DeLoach, Ph.D., concluded that Plaintiff "retains the capacity to perform simple tasks on a sustained basis." (Tr. at 297.) A Psychiatric Review Technique was completed on January 25, 2008. (Tr. at 310-23.)

A Mental RFC Assessment was also completed on January 25, 2008, by Dr. DeLoach. (Tr. at 306-09.) The assessment concluded that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, but was otherwise not significantly limited in understanding and memory. (Tr. at 306.) Plaintiff was also found to be moderately limited in her ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule and maintain regular attendance, the ability to sustain an ordinary routine, the ability to work in coordination with or proximity to others without being distracted by them, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 306-07.) Plaintiff was found to be not significantly limited in her ability to carry out very short and simple instructions, the ability to carry out detailed instructions, and the ability to make simple work-related decisions. (Tr. at 306.) Plaintiff was also found to be moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but was otherwise not significantly limited in social interaction. (Tr. at 307.) Plaintiff was determined to be moderately limited in her ability to respond appropriately to changes in the work setting and the ability to set realistic goals or make plans independently of others but was otherwise not significantly limited in adaptation. (Tr. at 307.) It was also concluded, however, that Plaintiff was "capable of simple one and two step tasks" and

that her "psychological limitations do not appear to interfere with the potential for work activities that are simple in nature." (Tr. at 308.) The assessor noted that Plaintiff "may function more effectively in small familial groups or working alone" and that she "retains the capacity to perform simple tasks on a sustained basis." (*Id.*)

Pursuant to Dr. Ingram's referral, Plaintiff underwent a therapy assessment on February 14, 2008, and was assessed a GAF score of 55. (Tr. at 382.) On May 30, 2008, Dr. Ingram noted that Plaintiff was "off the antidepressants, but is working with her therapist" and that Plaintiff "wished to be treated with antidepressants," so Dr. Ingram prescribed a "low dose of Effexor." (Tr. at 387.) Dr. Ingram noted in an addendum that Plaintiff "brought forth a letter apparently from the Bariatric Center expressing that they need a note suggesting she was participating in therapy" and that he was "concerned as most of her motivations appear to be toward approval for the bariatric surgery." (*Id.*) On August 13, 2008, Dr. Ingram noted that Plaintiff

> has missed two appointments and has not seen a therapist in a month. She requested I fill out work first paperwork stating she could not work. I indicated that I felt uncomfortable with that. She suggest she cannot work because of anxiety and depression, but I told her that if she was not working with her therapist, she has missed multiple appointments with me, and she has not been compliant with the medication and I would only documented [sic] that I felt that she was making some effort with the therapy. I encouraged her to take the medicines as directed and again I have addressed the work first excuse only after she is actively involved in therapy.

(Tr. at 390.) On September 12, 2008, Dr. Ingram indicated that he "did fill out the paperwork for her for a year" and that he "still wanted her to follow through" with therapy. (Tr. at 392.)

On January 12, 2009, Plaintiff was discharged from therapy and the reason was "Non-compliant/No contact." (Tr. at 396.) At that time, Plaintiff was assessed a GAF score of 45 and given a guarded prognosis. (Tr. at 397.)

On May 5, 2009, Dr. Ingram "review[ed] her missed appointments" and Plaintiff "suggested she is trying to get them switch[ed] [to] later in the afternoon" and that she was getting "more involved in therapy." (Tr. at 399.) On May 27, 2009, Dr. Ingram noted that he "filled out her housing disability information" and that Plaintiff "declined, suggesting she would like to give this more time and also work with therapist." (Tr. at 401.)

In December 2009, Dr. Ingram noted that Plaintiff was "congratulated again on weight loss" that had occurred since her bariatric lap-band surgery in September. (Tr. at 403.)

On March 31, 2010, Dr. Ingram completed a medical provider's assessment of ability to do mental work-related activities wherein he concluded that Plaintiff had no limitations in her ability to follow work rules, interact with supervisors, use judgment or function independently, but that she had moderate limitations in her ability to deal with the public, marked limitations in her ability to relate to co-workers and extreme limitations in her ability to deal with work stresses and her ability to maintain attention/concentration. (Tr. at 404.) Dr. Ingram also concluded that Plaintiff was not limited in her ability to understand, remember and carry out simple job instructions, but was moderately limited as to detailed but not complex instructions and markedly limited with respect to complex job instructions. (Tr. at 404-05.) Dr. Ingram further concluded that Plaintiff had marked limitations in her ability to behave in an emotionally stable manner and in her ability to relate predictably in social situations and had extreme limitations in her ability to demonstrate reliability. (Tr. at 405.) Dr. Ingram also found that Plaintiff had no limitations in her activities of daily living but had moderate limitations in maintaining social functioning and marked limitations in maintaining concentration, persistence or pace, and that Plaintiff had four of more episodes of decompensation, each of extended duration. (*Id.*)

### 3.    Plaintiff's Activity Report and Testimony

In her daily activity report, Plaintiff indicated that she takes care of her pets and her children with no help from others, but also stated that her children "do a lot on their own." (Tr. at 171.) Plaintiff indicated that it is very difficult sometimes but that she is able to do her own personal care. (*Id.*) Plaintiff stated she does not need reminders, she is able to prepare all kinds of meals on a daily basis, she is able to do "light housekeeping," she is able to drive alone, go outside for one half hour each day, and shop in stores for two hours at a time. (Tr. at 172-73.) Plaintiff is able to handle her own finances, watch television, talk with others, visit family and go to appointments on her own. (Tr. at 174.)

Plaintiff testified at the administrative hearing that she has seen a psychologist once a month in the past, "but now it's been every couple of months," and that she sees "the nurse in between to make sure the medicine's working okay or if he needs to readjust it." (Tr. at 40.) Plaintiff further testified that she has panic attacks "once in a while, not a whole lot," but that she "had them in the past." (Tr. at 41.) When asked about her symptoms from lupus, Plaintiff responded that she has "extreme fatigue" and "bad headaches." (*Id.*) When asked how often she experiences the headaches, Plaintiff stated that it was "sporadic," explaining that she "could get them, you know, a couple days in a row and then I'm fine, you know, but it comes and goes." (*Id.*) Plaintiff estimated she gets such headaches about five days out of each month and that when she has them, she "ha[s] to lay down and keep quiet and take some aspirin until it goes away." (Tr. at 46.) Plaintiff further testified that she "usually just take[s] over-the-counter [medicine], like aspirin or Extra Strength Tylenol" for her headaches, but if that doesn't help, she will sometimes take Vicodin. (Tr. at 41-42.)

Plaintiff stated that she "spend[s] a lot of time laying down during the day . . . because [her] body is just extremely tired." (Tr. at 42.) Plaintiff indicated that she could lift "5 to 10 pounds" throughout an eight-hour day. (*Id.*) Plaintiff stated that "sometimes" she has problems walking due to the "back pain going on, I walk pretty slow with that." (*Id.*) She added that she could walk for ten to fifteen minutes, stand for five to ten minutes, and sit for fifteen minutes before needing a break or to change positions. (Tr. at 42-43.) When Plaintiff's counsel asked her how her fatigue affects her ability to do chores around the house, Plaintiff responded, "Well, sometimes I can't do them at all. I have to let them go until I feel a little better." (Tr. at 44.) Plaintiff indicated that this fatigue happens on a daily basis. (*Id.*) Plaintiff stated that there are "some days" when she feels "okay" and "can do a little more," but that she has "[e]xtreme fatigue . . . [a]t least three quarters of the month." (Tr. at 45.) During periods of extreme fatigue, Plaintiff stated that she will "get up and maybe vacuum a little bit and then sit down and – or get up and do some dishes and it's just kind of – I spread it throughout the day, so." (*Id.*) Plaintiff also testified that her "severe bouts of

14

depression" last "about a week." (Tr. at 48.) She also stated that Vicodin was prescribed to her for

back pain and that she sometimes has to take it three times a day. (Tr. at 48-49.)

### 4.     Testimony from the Vocation Expert ("VE")

The ALJ asked the VE to assume a person with Plaintiff's background

> who's able to perform work at the light exertional level that does not require climbing, balancing, kneeling, crouching or crawling or more than occasional stooping and that consists of no more than simple routine repetitive tasks with one or two-step instructions, and doesn't include what I will call strict production quotas which I will define as the requirement to produce a specified number of units of work in a specific period of time.

(Tr. at 53.) The VE responded that such a person could perform Plaintiff's past relevant work as

a cashier and could also perform the 80,000 to 100,000 unskilled usher and parking lot attendant

positions available in the national economy. (Tr. at 53-54.) The ALJ then asked the VE to assume

the same criteria but consider work at the sedentary level with a sit/stand option and the VE

responded that there would be 95,000 office clerk positions and 65,000 reception and information

clerk positions that such a person could perform. (Tr. at 55.)

### F.     Analysis and Conclusions

### 1.     Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she retained the

residual functional capacity to perform a limited range of light work. (Tr. at 18-19.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his

application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to

the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld. Specifically, Plaintiff contends that the ALJ did not properly weigh the treating source opinions because he did not give controlling weight to Plaintiff's treating psychiatrist, Dr. Ingram, and failed to indicate what weight was given to Dr. Ingram's opinion. (Doc. 9 at 6-16.)

In weighing the opinions and medical evidence, the ALJ must consider relevant factors such as the length, nature and extent of the treating relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's evidentiary support, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). Therefore, a medical opinion of an examining source is entitled to more weight than a non-examining source and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time. 20 C.F.R. § 404.1527(d)(1)-(2). *See also Rogers*, 486 F.3d at 242 (stating that the "treating physician rule," which provides that "greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians," is a key governing standard in social security cases). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the opinion should be given: "the length of the treatment relationship and

the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. Where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error, as '[a] finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected.'" *Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 Fed App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

In the instant case, Dr. Ingram opined that Plaintiff had moderate limitations in her ability to deal with the public, marked limitations in her ability to relate to co-workers and extreme limitations in her ability to deal with work stresses and her ability to maintain attention and concentration. (Tr. at 404.) Dr. Ingram also concluded that Plaintiff was moderately limited as to detailed but not complex instructions and markedly limited with respect to complex job instructions. (Tr. at 404-05.) Dr. Ingram further concluded that Plaintiff had marked limitations in her ability to behave in an emotionally stable manner and in her ability to relate predictably in social situations and had extreme limitations in her ability to demonstrate reliability. (Tr. at 405.) Dr. Ingram also found that Plaintiff had moderate limitations in maintaining social functioning and marked limitations in maintaining concentration, persistence or pace and that Plaintiff had four of more episodes of decompensation, each of extended duration. (*Id.*)

The ALJ stated that "Dr. Ingram's opinion is not controlling on the issue of disability" because it was a form that did not refer to treatment records supporting the conclusions and because the treatment records "do not support the opinion." (Tr. at 17.) The ALJ indicated that he gave "significant weight to these treatment records, to the examination reports of Ms. Glowicki and Dr. Date, and to the expert opinion . . . of Joe DeLoach, Ph.D., who examined the record in this case in January 2008 . . . and concluded, as I do here that the claimant's depression, anxiety, and substance-addiction disorders were severe but not disabling." (Tr. at 17.)

Dr. DeLoach is a non-examining physician who completed the Mental RFC Assessment on January 25, 2008. (Tr. at 306-09.) Dr. Date and Ms. Glowicki are the examining physician and assistant who, at the request of DDS, examined Plaintiff on January 15, 2008. Therefore, the ALJ expressly relied on and gave "significant weight" to the opinions of a non-examining and an examining physician over Plaintiff's treating physician, Dr. Ingram. Although the ALJ is correct that the ultimate issue of disability is reserved for the Commissioner, that does not excuse the ALJ from failing to follow the framework for addressing the weight given treating sources. To the extent that the ALJ based his decision on Dr. Ingram's failure to refer to treatment records

supporting his opinions and because the ALJ found the treatment records "do not support the opinion[,]" (Tr. at 17), I suggest that the ALJ's analysis was insufficient.

Dr. Ingram qualified as a treating source because he was Plaintiff's treating psychiatrist and saw Plaintiff "with a frequency consistent with accepted medical practice." 20 C.F.R. § 404.1502. Dr. DeLoach's opinion as a non-examining physician should have been given "little weight" because it was "contrary to the opinion of the claimant's treating physician." *Adams,* 55 Fed. App'x at 284. The ALJ found that Plaintiff's treatment records did not support Dr. Ingram's opinion and thus, declined to give his opinion any apparent weight. The ALJ then failed to use the required factors to determine what weight the opinion should be given. *Wilson*, 378 F.3d at 544. Where, as here, the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded the[] treating source opinion[] . . . , [t]his alone constitutes error, as '[a] finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected.'" *Cole,* 652 F.3d at 660. Further, the ALJ's failure to follow this requirement "denotes a lack of substantial evidence[.]" *Rogers*, 486 F.3d at 243.

I further suggest that the record is devoid of substantial evidence when Plaintiff's physical and mental impairments are considered. Dr. Prakash diagnosed "clear-cut systemic lupus erythematosus" two years after the physical RFC assessment was completed. Therefore, the RFC would not adequately take this condition into account. Dr. Prakash further indicated that Plaintiff may also have multiple sclerosis or some other issue causing the brain lesions. (Tr. at 435.)

In addition, although the ALJ stated that, "[t]o the extent the claimant alleges that she cannot work within the scope of the RFC, I find the allegation not fully credible[,]" I suggest that substantial evidence does not support this conclusion. The ALJ did not "clearly state his reasons for doing so," especially with respect to mental impairments. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). Instead, it appears the ALJ erroneously disregarded Plaintiff's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work" "*solely* because they are not substantiated by objective medical evidence." S.S.R. 96-7p, at *1 (emphasis added). The ALJ should have considered all of the

19

requisite six factors rather than focusing on two factors, i.e., conservative treatment and her ability to "function as a single parent." (Tr. at 19.) *Felisky,* at 1039-40; S.S.R. 96-7p, at *3. Plaintiff's testimony as to her extreme fatigue is fully consistent with her lupus and depression and were, I suggest, not properly discounted. (Tr. at 41-48.)

Once it has been determined that the Commissioner's administrative decisions are not supported by substantial evidence, a district court faces a choice. It may either remand the case to the Commissioner for further proceedings or direct the Commissioner to award benefits. The court may reverse and direct an award of benefits if "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits . . . where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Felisky,* 35 F.3d at 1041; *accord, Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). This comports with the principle that "where remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." *Wilson v. Comm'r of Soc. Sec.*, 378 F3d 541, 547 (6th Cir. 2004) (citations omitted).

In this case, for the reasons set forth above, I conclude that there are no unresolved legal or factual issues and that the record adequately establishes Plaintiff's entitlement to benefits. I therefore suggest that the ALJ's decision should be reversed and the case remanded for an award of benefits.[4]

### 3.  Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, was not supported by substantial evidence. I therefore recommend that Plaintiff's motion for summary judgment be granted and

---

[4]Plaintiff further contends that the ALJ erroneously concluded that Plaintiff could perform a limited range of light work despite her systemic lupus erythmotosus and herniated cervical and thoracic discs (Doc. 9 at 17-25), that the "ALJ's rejection of Plaintiff's testimony regarding the extent of her symptoms is not supported by substantial evidence," and that Plaintiff's "testimony of her symptoms are [sic] consistent with the medical evidence." (Doc. 9 at 25.) However, based on resolution of the treating source argument, these arguments need not be addressed.

20

Defendant's motion for summary judgment be denied, and that the case be remanded for an award of benefits.

## III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.


                                                          s/ Charles E Binder
                                                          CHARLES E. BINDER
Dated: June 4, 2012                                       United States Magistrate Judge

### CERTIFICATION
I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  June 4, 2012                        By     s/Patricia T. Morris
                                                  Law Clerk to Magistrate Judge Binder